******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMIE E. O'NEILL *v.* ANTHONY J. O'NEILL
(AC 44070)

Bright, C. J., and Clark and Eveleigh, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving his marriage to the plaintiff and making certain orders regarding the parties' finances and custody of the parties' five minor children. *Held*:

1. The defendant could not prevail on his claim that the trial court abused its discretion in awarding periodic alimony and child support in amounts that he claimed would far exceed his net income: the support orders would not exceed his net income on the basis of the trial court's finding as to the defendant's net earning capacity, which amount was supported by certain evidence in the record; moreover, the trial court found the defendant's testimony about his finances to be not credible, and, although the summary prepared by the defendant's accountant indicated a lower figure for his average net income, the court was not required to base its orders on that figure as the accuracy of that figure as a predictor of the defendant's earning capacity was suspect, given that it reduced the defendant's net income by the penalties and interest he incurred for filing his tax returns late.

2. The trial court did not abuse its discretion in ordering the defendant to pay increased alimony once the plaintiff vacated the marital residence: although the plaintiff had no mortgage or rent expense while she remained in the marital residence, that residence was the subject of a foreclosure action and the plaintiff would incur additional housing expenses once she relocated.

3. The trial court did not abuse its discretion in precluding modification of the alimony award on the basis of the plaintiff's cohabitation with other adults: the court had the authority to award nonmodifiable alimony under the applicable statute (§ 46b-86), its decision to do so was supported by the record given the plaintiff's arrangement to provide care for her elderly father, and its order did not conflict with the cohabitation subsection, § 46b-86 (b).

4. The defendant's claim that the trial court improperly awarded the marital residence to the plaintiff without specifying that she would take the residence subject to any liens on the property was without merit: the court specified that the plaintiff was entitled to "any net equity" following the sale of the marital residence, which established that the plaintiff would be entitled only to the proceeds of the sale of the property in excess of claims or liens against it.

5. The trial court did not abuse its discretion in ordering that the plaintiff could relocate to a reasonable distance from Wilton or New York with the minor children: the court was not required to consider and apply the factors set forth in the statute (§ 46b-56d) governing postjudgment motions to relocate with a minor child, where, as here, the relocation matter was decided in the initial judgment dissolving the parties' marriage; moreover, the defendant did not claim that the trial court failed to consider the best interests of the children under the applicable statute (§ 46b-56 (c)), and evidence in the record supported the court's conclusion on that issue.

6. The defendant could not prevail on his claim that the trial court's order was ambiguous as to when alimony terminated: the order clearly stated that alimony terminated ten years after the judgment of dissolution or when the plaintiff died or remarried.

Submitted on briefs September 14—officially released December 7, 2021

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield and tried to the court, *Rodriguez, J.*; judgment dissolving the marriage and granting certain

other relief, from which the defendant appealed to this court. *Affirmed.*

*Charles T. Busek* submitted a brief for the appellant (defendant).

*Jonathan E. Von Kohorn* and *Tara L. Von Kohorn* submitted a brief for the appellee (plaintiff).

*Opinion*

BRIGHT, C. J. The defendant, Anthony J. O'Neill, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Jamie E. O'Neill. On appeal, the defendant claims that the court abused its discretion by (1) ordering him to pay periodic alimony and child support in amounts that exceed his net income, (2) ordering that his alimony obligation would increase to $1000 per week after the plaintiff vacates the marital residence, (3) precluding modification of the alimony award on the basis of the plaintiff's cohabitation with other adults, (4) awarding the plaintiff the marital residence without specifying that the plaintiff takes the property subject to all mortgages and liens of record, (5) granting the plaintiff's request to relocate with the minor children, and (6) failing to order that alimony will terminate ten years after the date of the judgment. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The plaintiff and the defendant were married in Greenwich in 2003, and have five minor children together. While married, the parties resided in Wilton, and their children attended the Wilton public schools. In 2018, the plaintiff commenced an action to dissolve the parties' marriage, and the court, *Gould, J.*, accepted the parties' agreement providing, inter alia, that the defendant would pay pendente lite child support in the amount of $477 each week and pendente lite alimony in the amount of $288 each week. On December 4, 2019, the case was tried to the court, *Rodriguez, J.*, and both parties testified at trial. On February 21, 2020, the court issued its memorandum of decision dissolving the parties' marriage.

In its decision, the court made the following findings and issued the following orders. "The defendant's employment essentially consisted of the overseeing of residential construction and remodeling. The plaintiff worked full-time as a secretary prior to the birth of the parties' five children. Although [the defendant] claims that [the plaintiff] is capable of presently earning an annual income equal to about $38,000, the court is not persuaded and discredits his testimony with respect to this claim.

"Although [the defendant's] testimony and financial affidavits reference no earned income whatsoever, the court finds that he has an imputed earning capacity of at least $101,000 per year. This is largely based upon tax returns for the years 2013 through 2018. The existence of other assets which the defendant has or had in Ireland [suggests] that the defendant may very well have access to additional income from family members outside of the United States. However, based on the evidence presented, the court is not considering any possible assets of [the defendant] in Ireland in making

its finding of his imputed earning capacity.

"The court credits [the plaintiff's] testimony that with help from her family and with part-time employment and child support payments from [the defendant], she will be able to continue to reside in the marital residence and that she will be able to sell the residence without interference from [the defendant]. She has been receiving child support in the amount of $477 a week and, at the time of trial, [the defendant] was current in his child support payments. Most of the household expenses are paid by [the defendant] who manages construction jobsites. [The plaintiff] would like to leave the family residence as soon as possible but not until the foreclosure proceedings are resolved. . . .

"The marital residence . . . in Wilton . . . was purchased in May or June of 2004 and is the subject of a foreclosure proceeding. There were extensive renovations and improvements made to the property by [the defendant]. . . . [The plaintiff] is not named as a defendant in the foreclosure proceedings. Although the court ordered on June 6, 2019, that the property be sold, primarily due to the lack of cooperation by [the defendant], the property has not been sold. The court orders that [the plaintiff] shall exercise final decision making regarding any options in regards to the sale in light of the pending foreclosure action. So . . . the property is ordered sold and the net proceeds realized from the sale, if any, are awarded to [the plaintiff].

"[The defendant's] request that the court compel [the plaintiff] and the children to continue to reside at the marital home in Wilton . . . is rejected. Such a request is unwarranted, unreasonable and leads the court to conclude that [the defendant] has economic resources available to him which he has not disclosed to the court. However, and as previously noted, [the defendant] clearly has an earning capacity of $101,000, and the court has not considered this conclusion in its finding of [the defendant's] earning capacity. He is in good health and he is a self-employed individual. [The plaintiff], originally from Long Island, New York, is granted her request to relocate her residence to a reasonable distance from Wilton or New York for necessary housing opportunities especially given the lack of anticipated reliable support from [the defendant].

"A stipulated child support guidelines worksheet has been reviewed by the court . . . and it does not correspond precisely to the financial affidavit of the defendant . . . which he submitted at the commencement of trial. However, [the defendant] consents to utilizing these child support guidelines with respect to his income notwithstanding that the most recent financial affidavits referenced . . . no earned income whatsoever.

"In addition to the five minor children of this marriage

residing with [the plaintiff] at the marital residence . . . the plaintiff's father is also residing at the marital residence. [The plaintiff], who is in good health, provides care for her eighty-four year old father. Her father assists her financially with some of the household expenses. She is committed to continuing the care she provides for her father in the foreseeable future. Also, [the plaintiff] is fortunate to have childcare help available to her from her children who babysit for the younger ones when necessary. . . .

"There is a temporary order that [the plaintiff] and [the defendant] have joint legal custody with primary physical residence to [the plaintiff]. The court makes said temporary order a permanent order in its judgment herein and finds that it is in the best interests of the children that there be joint legal custody and that the primary residence continue to be with [the plaintiff]. She shall have final decision making over day-to-day decisions concerning the minor children.

* * *

"Child support is ordered to continue in the amount of $477 per week. The parties shall share any unreimbursed medical/dental expenses, including braces, and qualified work-related childcare expenses with [the defendant] paying 75 percent and [the plaintiff] paying 25 percent. . . .

"The court orders that [the defendant] pay [the plaintiff] periodic alimony in the amount of $1000 per week for a period of ten years from the date of the judgment of dissolution. However, payments shall begin when [the plaintiff] vacates the marital residence . . . . Until [the plaintiff] vacates the marital residence, the current pendente lite order shall continue in effect so that [the defendant] continues to pay $280 per week in order to cover expenses of gas, oil, electric and landscaping as well as cell phones for the children. Alimony shall terminate upon the death or remarriage of [the plaintiff]. There shall be no change as to alimony based upon cohabitation by [the plaintiff] because it is expected that she will continue to live with other adults who will help her with her living expenses. . . .

"[The plaintiff] is awarded the marital residence free and clear of any claim by [the defendant]. [The plaintiff] shall sell the property and take control over the sale process in order to attempt to protect any net equity notwithstanding the foreclosure action. [The defendant] is ordered to cooperate in any sale or foreclosure process to facilitate such a sale. Any net equity shall remain the sole property of [the plaintiff]. [The plaintiff] shall continue to have sole possession and exclusive use of the property."

On March 9, 2020, the defendant filed a motion to open and reargue the decision, which the court denied on March 17, 2020. This appeal followed. Additional

facts will be set forth as necessary.

We first set forth the standard of review for all of the defendant's claims on appeal. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Emerick* v. *Emerick*, 170 Conn. App. 368, 378, 154 A.3d 1069, cert. denied, 327 Conn. 922, 171 A.3d 60 (2017).

I

The defendant first claims that the court abused its discretion in awarding periodic alimony and child support in amounts that "would far exceed the net income resulting from $101,000 of gross earning capacity." The following additional facts are relevant to the defendant's claim.

The defendant filed his financial affidavit in November, 2019, stating that he had no income. At trial, he testified that he is a self-employed building contractor engaging in residential construction and remodeling through his limited liability company, Anthony O'Neill, LLC. He explained that he was working "[p]retty small" jobs for which he was getting paid "[v]ery small amounts . . . ." He also testified that he has "bids out for probably like 7 or $800,000 worth of work. . . . So the profit on that would be maybe a $100,000. It all depends, maybe nothing."

During the marriage, the parties filed their tax returns separately, but the defendant failed to file his tax returns for the years 2013 through 2017, until January, 2019, which was after the plaintiff initiated the divorce proceedings. Consequently, he incurred penalties and interest in connection with his delinquent tax returns. At trial, the court admitted into evidence the defendant's federal tax returns for the years 2013 through 2018, and a two page summary prepared by the defendant's accountant setting forth his state and federal tax

liabilities, his net business income, and his personal net income for those years. According to the summary, during that six year period, the defendant's average net income was $63,477.33 and his combined federal and state tax liability was $222,950, which included penalties and interest.

The plaintiff's counsel questioned the defendant regarding his net income in the following exchange:

"Q. . . . So, sir, you'd agree with me, wouldn't you, that if you were to make a representation about what your net income is, that . . . traditionally most people would think that would include your gross income less taxes. Is that—I just want to make sure we're using the same language.

"A. Yes.

"Q. Okay. And that if we were going to reduce that by one, two, three, four, five, six years of penalties and interest, that that would bring down your net income beyond what normal—normally someone would think of as what that net income would represent. Is that fair to say?

"A. Not really, no, because it depends when you've paid your taxes. If you've paid your tax on time you wouldn't have the penalties and interest.

"Q. Right, but you didn't, though.

"A. I know, but I'm just saying that you said that in a normal situation."

In its memorandum of decision, the court found that the defendant has an earning capacity of $101,000 but failed to specify whether that figure constituted the defendant's net or gross earning capacity. After this appeal was submitted on the briefs, this court ordered the trial court, pursuant to Practice Book § 60-5,[1] to articulate whether its finding as to the defendant's earning capacity constituted the defendant's net or gross earning capacity and to specify the evidentiary basis for its finding.

On October 1, 2021, the court issued an articulation, clarifying that, on the basis of the defendant's tax returns, it found that the defendant has a net earning capacity of $101,000. The court also explained that the defendant's "testimony regarding his income was evasive and somewhat not credible. Specifically, his testimony about his income and his financial affidavit dated November 26, 2019, that he had no income for the year 2019 are not credible. His responses regarding year to date earnings for 2019 are not credible, especially since his gross receipts in the year 2017 were $204,000. . . .

"[The defendant] also claimed to have bids for about $800,000 worth of work which would realize a profit of $100,000 . . . and has basically owned his own business for about twenty-five years."

In light of the court's articulation specifying that it found the defendant's net earning capacity is $101,000, the defendant's claim that the total amount due under the support orders would exceed his net income necessarily fails. Insofar as he is claiming that the court's finding as to his net earning capacity is clearly erroneous, we disagree.

"It is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards . . . on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn . . . .

"Factors that a court may consider in calculating a party's earning capacity include evidence of that party's previous earnings . . . [l]ifestyle and personal expenses . . . and whether the defendant has wilfully restricted his earning capacity to avoid support obligations, although we never have required a finding of bad faith before imputing income based on earning capacity. . . .

"Whether to base its financial orders on the parties' actual net income or their earning capacities is left to the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *Buxenbaum* v. *Jones*, 189 Conn. App. 790, 799–801, 209 A.3d 664 (2019).

In the present case, the court based its support orders on the defendant's net earning capacity, which it determined was $101,000. This finding is supported by the evidence. First, the defendant's tax returns and the summary prepared by his accountant substantiate a net earning capacity of $101,000 per year. Although the defendant relies on the summary prepared by his accountant representing that his *average* net income between 2013 and 2018 was $63,477.33, the court was not required to base its orders on that figure. See *Buxenbaum* v. *Jones*, supra, 189 Conn. App. 799 ("[i]t is well established that the trial court may . . . base financial awards . . . on the earning capacity of the parties rather than on actual earned income"). In fact, the accuracy of the net income in the accountant's summary as a predictor of earning capacity is suspect, given that the defendant's net income for each year was reduced by the penalties and interest he incurred for filing his tax returns late. Without question, it is proper for a court to ignore such self-inflicted reductions in income when determining a party's earning capacity. When the penalties and interests are removed from the defendant's presentation of his net income, the evidence supports the court's conclusion as to the defendant's earn-

ing capacity. Specifically, for tax year 2017, the summary prepared by the defendant's accountant states that his net business income was $160,882, that he owed $74,421 for federal and state income taxes, and that his net income was $86,461. The defendant's 2017 federal tax return, however, specifies that he owed $48,469 in federal income tax and $15,602 in penalties and interest. Significantly, if the defendant's purported "net income" of $86,461 was not reduced by $15,602 in penalties and interest, it would have been $102,063.

In addition, the court found that the defendant is in good health and has been operating his own business for almost twenty-five years. The court further emphasized that it found the defendant's testimony regarding his finances to be "evasive" and "not credible." Finally, the court noted in its articulation that the defendant testified that he had submitted bids for construction work that, if accepted, would be worth $100,000 in profit for him. On the basis of our review of the entire record, we cannot conclude that the court's finding that the defendant has a net earning capacity of $101,000 is clearly erroneous.

II

The defendant next claims that the court improperly ordered him to pay $1000 per week in alimony beginning when the plaintiff vacates the marital residence. He argues that there is insufficient evidence to support the court's prospective alimony award because there was no evidence regarding the plaintiff's needs after she vacates the marital residence. We disagree.

"Time limited alimony is often awarded. . . . The trial court does not have to make a detailed finding justifying its award of time limited alimony. . . . Although a specific finding for an award of time limited alimony is not required, the record must indicate the basis for the trial court's award. . . . There must be sufficient evidence to support the trial court's finding that the spouse should receive time limited alimony for the particular duration established. If the time period for the periodic alimony is logically inconsistent with the facts found or the evidence, it cannot stand. . . . In addition to being awarded to provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency, time limited alimony is also appropriately awarded to provide interim support until a future event occurs that makes such support less necessary or unnecessary." (Internal quotation marks omitted.) *Radcliffe* v. *Radcliffe*, 109 Conn. App. 21, 29, 951 A.2d 575 (2008).

In the present case, the court found that, prior to the birth of the parties' five children, the plaintiff worked full-time as a secretary and that she "has had some college education but she has not been very active in

the employment market since the birth of her five children. She is attempting to obtain employment at the Wilton school system and/or the Danbury school system." The court rejected the defendant's claim that the plaintiff has an earning capacity of $38,000, and it found that the defendant is in good health, has an earning capacity of $101,000, and has paid for most of the household expenses. In addition, the court credited the plaintiff's testimony "that with help from her family, and with part-time employment and child support payments from [the defendant], she will be able to continue to reside in the marital residence . . . ." The court noted that the marital residence was the subject of a foreclosure action, and the plaintiff's financial affidavit indicated that she had no mortgage or rent expense.

On the basis of its findings, the court ordered that the defendant shall continue to pay the plaintiff $280[2] per week in alimony, to cover utilities, landscaping, and cell phones for the children, until she vacates the marital residence, at which point he shall pay her $1000 per week in alimony. Although the court did not make detailed findings with regard to its alimony award, we conclude that the record supports the award. The court structured its award so that the plaintiff would receive a reduced amount of alimony for the period of time that she remained in the marital residence and had no mortgage or rent expense. Further, the court knew from the evidence and its orders that the plaintiff would require a residence large enough to accommodate her five children and her father and that such residence would be within a reasonable distance from Wilton or New York. In light of these findings, it was reasonable for the court to conclude that the plaintiff would require additional support once she vacates the marital residence and incurs additional housing expenses. Accordingly, the court did not abuse its discretion in structuring the alimony award as it did.

### III

The defendant's third claim is that the court abused its discretion in precluding modification of the periodic alimony award based on cohabitation under General Statutes § 46b-86 (b).[3] He argues that, under § 46b-86 (b), "the payor of alimony has a statutory right to pursue modification of alimony for cohabitation of the other party if the cohabitation alters the financial needs of the payee. However, our trial court erased that right, without any evidence as to identifying with whom she would cohabit, where, her needs and the benefit of a financial evidentiary picture when that occurred. In briefing this issue, I did not find any case where the trial court effectively eliminated the cohabitation statutory modification rights of the payor. The trial court orders in this regard are contrary to the rights outlined in that statute." We are not persuaded.

"[Section] 46b-86 (b), the so-called cohabitation stat-

ute, was enacted four years after § 46b-86 (a) to correct the injustice of making a party pay alimony when his or her ex-spouse is living with a person of the opposite sex, without marrying, to prevent the loss of support." (Internal quotation marks omitted.) *Wichman* v. *Wichman*, 49 Conn. App. 529, 532, 714 A.2d 1274, cert. denied, 247 Conn. 910, 719 A.2d 906 (1998).

"It is a well settled principle of matrimonial law that courts have the authority under § 46b-86 to preclude the modification of alimony awards. . . . Section 46b-86 (a) itself provides in relevant part that [*u*]*nless and to the extent that the decree precludes modification* . . . any final order for the periodic payment of permanent alimony . . . may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party. . . . This statute clearly permits a trial court to make periodic awards of alimony nonmodifiable." (Emphasis in original; internal quotation marks omitted.) *Brown* v. *Brown*, 148 Conn. App. 13, 24–25, 84 A.3d 905, cert. denied, 311 Conn. 933, 88 A.3d 549 (2014). Furthermore, "[i]t is well established by our case law that the trial court, as a part of its right to award nonmodifiable alimony and its equitable powers, has the legal authority to order alimony that does not terminate even in the event of remarriage or cohabitation." (Internal quotation marks omitted.) *Sheehan* v. *Balasic*, 46 Conn. App. 327, 331, 699 A.2d 1036 (1997), appeal dismissed, 245 Conn. 148, 710 A.2d 770 (1998).

In the present case, the court found that the plaintiff "provides care for her eighty-four year old father. Her father assists her financially with some of the household expenses. She is committed to continuing the care she provides for her father in the foreseeable future." Recognizing this arrangement, the court, in making its alimony order, specifically addressed the nonmodification of alimony, stating: "There shall be no change as to alimony based upon cohabitation by [the plaintiff] because it is expected that she will continue to live with other adults who will help her with her living expenses."

Accordingly, because the court has the statutory authority to award nonmodifiable alimony and because the record supports its decision to do so, we conclude that the court's alimony order neither conflicts with § 46b-86 (b) nor constitutes an abuse of discretion.

IV

Next, the defendant claims that the court improperly awarded the marital residence to the plaintiff without specifying that she would take it subject to any liens on the property. The defendant misunderstands the court's order.

In its memorandum of decision, the court found that the marital residence is the subject of a foreclosure

action and that there are several liens on the property, including federal and state tax liens. The court awarded the plaintiff the marital residence "free and clear of any claim by [the defendant]. [The plaintiff] shall sell the property and take control over the sale process in order to attempt to protect any net equity notwithstanding the foreclosure action. . . . Any net equity shall remain the sole property of [the plaintiff]."

The court's order specifies that the plaintiff is entitled to "any net equity" following the sale of the marital residence. "Equity" is defined as "the money value of a property or of an interest in a property in excess of claims or liens against it." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 423. Given this definition, the court's order establishes the very point that the defendant claims requires further specification—that is, that the plaintiff is entitled to the proceeds of the sale of the property in excess of claims or liens against it. Accordingly, the defendant's claim is without merit.

V

The defendant's fifth claim is that the court abused its discretion in granting the plaintiff the right to relocate a reasonable distance from Wilton or New York without considering General Statutes § 46b-56d,[4] which provides several factors for a court to consider and apply when deciding a *postjudgment* motion to relocate with a minor child. The defendant argues: "Under [§ 46b-56d] the court is assigned the task of determining whether the move would have a substantial impact on an existing parenting plan. . . . [The court's] order is without additional evidence as to where [the plaintiff] is relocating or the impact on the existing parenting plan. The order effectively eliminates [the defendant's] rights under the relocation statute to identify the impact on the parenting plan and to have an evidentiary hearing on the issue." We are not persuaded.

Section 46b-56d provides in relevant part: "(a) In any proceeding before the Superior Court *arising after the entry of a judgment awarding custody of a minor child* and involving the relocation of either parent with the child, where such relocation would have a significant impact on an existing parenting plan, the relocating parent shall bear the burden of proving, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, (2) the proposed location is reasonable in light of such purpose, and (3) the relocation is in the best interests of the child. . . ." (Emphasis added.)

By its plain language, § 46b-56d applies when the relocation issue arises after the entry of a judgment awarding custody of a minor child. Accordingly, § 46b-56d does not apply in the present case because the relocation issue was decided in the initial judgment dissolving the parties' marriage at the same time that

the court was establishing the parenting plan. See, e.g., *Lederle* v. *Spivey,* 113 Conn. App. 177, 187 n.11, 965 A.2d 621 ("[t]he enactment of . . . § 46b-56d clearly changed the analysis and the burden allocation in *post-judgment* relocation cases, but there is no indication that the legislature intended it to apply to relocation matters resolved at the time of the initial judgment for the dissolution of a marriage" (emphasis added)), cert. denied, 291 Conn. 916, 970 A.2d 728 (2009). Indeed, this court has held that "relocation issues that arise at the initial judgment for the dissolution of marriage continue to be governed by the standard of the best interest of the child as set forth in [General Statutes] § 46b-56."[5] Id., 187.

In the present case, the defendant does not claim that the court failed to consider the best interests of the children under § 46b-56 (c) in deciding the relocation issue, and there is sufficient evidence in the record to support the court's conclusion on that issue. Accordingly, we conclude that the court did not abuse its discretion in granting the plaintiff's request to relocate with the minor children.

VI

Finally, the defendant claims that the court erred in failing to specify that his alimony obligation would terminate after ten years from the date of the dissolution judgment. The defendant argues that the court's order is ambiguous because it provides that alimony terminates upon the death or remarriage of the plaintiff, but it fails to specify that alimony also terminates after ten years from the date of dissolution. We disagree.

In its memorandum of decision, the court ordered "that [the defendant] pay [the plaintiff] periodic alimony in the amount of $1000 per week *for a period of ten years from the date of the judgment of dissolution.* However, payments shall begin when [the plaintiff] vacates the marital residence . . . . Until [the plaintiff] vacates the marital residence, the current pendente lite order shall continue in effect so that [the defendant] continues to pay $280 per week in order to cover expenses of gas, oil, electric and landscaping as well as cell phones for the children. Alimony shall terminate upon the death or remarriage of [the plaintiff]." (Emphasis added.)

As the quoted passage makes clear, the court ordered that alimony terminates ten years after the judgment of dissolution or when the plaintiff dies or remarries. Accordingly, we conclude that the court's order is not ambiguous and does not constitute an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Under Practice Book § 60-5, this court "may order a further articulation of the basis of the trial court's factual findings or decision."

[2] We note that, although the court ordered that "the current pendente lite order shall continue in effect so that [the defendant] continues to pay $280 per week" in alimony, the pendente lite order provided that the defendant would pay the plaintiff $288 per week in alimony. Nevertheless, neither party has raised a claim regarding this discrepancy.

[3] General Statutes § 46b-86 (b) provides: "In an action for divorce, dissolution of marriage, legal separation or annulment brought by a spouse, in which a final judgment has been entered providing for the payment of periodic alimony by one party to the other spouse, the Superior Court may, in its discretion and upon notice and hearing, modify such judgment and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should result in the modification, suspension, reduction or termination of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party. In the event that a final judgment incorporates a provision of an agreement in which the parties agree to circumstances, other than as provided in this subsection, under which alimony will be modified, including suspension, reduction, or termination of alimony, the court shall enforce the provision of such agreement and enter orders in accordance therewith."

[4] General Statutes § 46b-56d provides: "(a) In any proceeding before the Superior Court *arising after the entry of a judgment awarding custody of a minor child* and involving the relocation of either parent with the child, where such relocation would have a significant impact on an existing parenting plan, the relocating parent shall bear the burden of proving, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, (2) the proposed location is reasonable in light of such purpose, and (3) the relocation is in the best interests of the child.

"(b) In determining whether to approve the relocation of the child under subsection (a) of this section, the court shall consider, but such consideration shall not be limited to: (1) Each parent's reasons for seeking or opposing the relocation; (2) the quality of the relationships between the child and each parent; (3) the impact of the relocation on the quantity and the quality of the child's future contact with the nonrelocating parent; (4) the degree to which the relocating parent's and the child's life may be enhanced economically, emotionally and educationally by the relocation; and (5) the feasibility of preserving the relationship between the nonrelocating parent and the child through suitable visitation arrangements." (Emphasis added.)

[5] General Statutes § 46b-56 provides in relevant part: "(a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may make or modify any proper order regarding the custody, care, education, visitation and support of the children . . . .

"(b) In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. . . .

"(c) In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, [sixteen enumerated] factors . . . . The court is not required to assign any weight to any of the factors that it considers . . . ."